IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 9, 2016

## STATE OF TENNESSEE v. ROBERT G. THORNTON, JR.

**Appeal from the Circuit Court for Hickman County**
**No. 145023CR     James G. Martin, III, Judge**

_____

**No. M2015-01895-CCA-R3-CD – Filed June 22, 2017**
_____

Following a jury trial in Hickman County Circuit Court, Defendant, Robert G. Thornton, Jr., was convicted of two counts of rape. The trial court merged the convictions and sentenced Defendant to twelve years in the Department of Correction to be served at 100%. On appeal, Defendant argues: (1) that the trial court improperly refused to strike a juror for cause; (2) that the trial court erred by denying his motion for a mistrial; (3) that the evidence was not sufficient to support his rape convictions; and (4) that his sentence is excessive. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Richard Boehms, Hohenwald, Tennessee, for the appellant, Robert G. Thornton, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Kim R. Helper, District Attorney General; and Kate Yeager Delk, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Background*

**State's Proof**

Tina Thigpen is the Principal at the Hickman County Middle School. During the 2012-2013 school year she was employed as a guidance counselor at the school. On May 2, 2013, Ms. Thigpen was requested to speak with the victim after there had been a fight

during recess that day. The victim did not participate in the fight although he was the "subject" of the fight. Ms. Thigpen called the victim into her office, and they had a conversation. The victim was concerned that he had an STD, which raised many "red flags" with Ms. Thigpen. She continued speaking with the victim and suggested that he be tested. The victim became "visibly shaken, scared, upset," and he began crying. Ms. Thigpen testified that she felt the need to notify the school principal, the victim's mother, and law enforcement. The victim's mother and law enforcement later arrived at the school.

The victim's mother testified that she has three sons. At the time of the offenses, the victim was fourteen years old and in the eighth grade. The victim's mother testified that he liked sports and music, and she described him as a quiet child who was "sweet and kind."

On May 2, 2013, the victim's mother received a call from Ms. Thigpen at the Hickman County Middle School. The victim's mother then left work and drove to the school. She walked into the room where the victim was sitting, and she immediately noticed that he was very upset. She knew that there was "something drastically wrong with him."

The victim's mother noted that the victim spent nearly every weekend with his father, from whom the victim's mother had been divorced since 2000. She had noticed changes in the victim in the weeks leading up to May 2, 2013. The victim's mother described him as "more distan[t] than ever," and he spent a lot of time in bed. She also testified that the victim constantly wore a hoodie, and he was "very sick all of the time."

The victim testified that he met Defendant during the victim's eighth grade year at school. He said that he went to Defendant's house with a friend, J.D., for a birthday party. The victim testified that there was alcohol at the party, and everyone was drinking except for Defendant. The victim said that he drank "two shots." He and J.D. then spent the night at Defendant's house. After that, the victim testified that he and J.D. visited Defendant's house every other week for a "month or a month and a half." The victim testified that Defendant had a television but he did not have cable. Defendant also usually had alcohol for them to drink. The victim testified that he and J.D. usually talked and hung out together while at Defendant's house. He said that Defendant also had a roommate but the victim only saw him one time. The victim also saw other people at Defendant's house who were older than the victim. He said that there were no rules at Defendant's house. The victim testified that the main reason he went to Defendant's house was to "hang out" with J.D. He said that Defendant was always there and sitting "in front of his couch or on the chair."

The victim described his relationship with Defendant as someone he could talk to and "open up to for problems." The victim testified that J.D. and Defendant were at Defendant's house the last time that the victim was there. He said that he and J.D. were "messing around being stupid," and Defendant had rum and Mountain Dew at the house. Defendant mixed the two ingredients together and gave it to the victim. The victim thought that J.D. also had a drink. The victim testified that he drank two cups of the mixture and began to feel lightheaded and off balance. He said, "Like whenever I was turning or tried to move my eyes everything felt like it was going like in slow motion and moving all together I guess." The victim testified that he had never drank that much or felt that way before.

The victim testified that Defendant showed the victim and J.D. some pornography that was playing on the television, and the victim and J.D. then went to the back room of the house and talked. The victim described the room as the closest one to the living room. He said that Defendant walked into the room while the victim and J.D. were on the bed talking. The victim testified that Defendant asked him if he wanted to "try anal or anything with a guy," and the victim told him, "I didn't want to." The victim said that the next thing he remembered was being facedown and feeling a sharp pain inside his "butt." He could not turn around to see what was inside of him but he felt a "ripping" sensation. The victim testified that he felt J.D.'s hand on his back, and J.D. told Defendant to stop because he was hurting the victim. The victim said that he could not tell Defendant to stop because he was in too much pain. He testified that the pain stopped after a while, and he "just kind of laid there," and J.D. hugged him. The victim testified that J.D. was in the room the entire time that Defendant was raping him. He said that Defendant did not say anything and left the room after the rape. The victim went to sleep, and Defendant was gone when he woke up at approximately 7:30 to 8:00 a.m. the next morning. The victim left Defendant's house and walked to his girlfriend's house. The victim did not tell anyone what happened because he was scared and wanted to forget about it.

The victim admitted that he spoke with a detective a few weeks before he told Ms. Thigpen what happened. He did not tell the detective about the rape because he did not want to talk about it, and he wanted to "leave it alone and forget about it." The victim said that he finally told Ms. Thigpen what happened because he trusted her, and Defendant was in jail and "already caught." The victim testified that it was difficult to tell his mother what happened, and he did not want anyone to "feel bad" for him.

On cross-examination, the victim testified that Defendant never personally invited the victim to his house, and he did not pressure the victim to drink alcohol or watch pornography on television. The victim admitted that he asked for alcohol the last time that he was at Defendant's house. He recalled talking to a woman a few weeks after he disclosed the rape. The victim told the woman that he went to Defendant's house three

times, and Defendant was at the house one of those times. He did not feel comfortable telling the woman the whole truth and everything that went on. He said that he was afraid to tell her how many times he went to Defendant's house and what he was doing there.

The victim testified that he was wearing tight stretchy pants at the time of the rape. He described them as "like the ones you probably get from like Hot Topic or kind of store like that." He also usually wore "band shirts." The victim did not recall how his pants were removed, and he said that Defendant pushed him from the shoulder, and he was face down on the bed. He did not know how long the rape lasted, and he could not do anything to stop it. The victim testified: "I was like I blacked out once my face hit the bed. I couldn't - - I wasn't - - I was kind of shocked at the moment. I didn't know what was going on and I felt a sharp pain." The victim said that he could not "really move," and it "hurt real bad." He felt as though he "couldn't do anything about it." The victim testified that he felt a hand on his back, and he knew that it was J.D.'s hand "because it felt gentle [.]" He heard J.D. yelling "stop you're hurting him." The victim again testified that J.D. hugged him, and the victim went to sleep. He did not recall telling the woman during the interview that he went into the living room after the rape and slept on the couch with J.D. The victim also did not recall telling the woman during the interview that Defendant used baby oil from the nightstand and that the rape lasted approximately fifteen to thirty minutes.

The victim did not recall every time that he went to Defendant's house but he said that Defendant was there. However, Defendant would sometimes leave after the victim got there. He did not recall telling Officer Mobley that he had been to Defendant's house four times, that Defendant was not there the first two times, and that Defendant was only there for fifteen minutes the third time the victim was there. The victim testified that he spent the night at Defendant's house two times. On redirect examination, the victim testified that he never returned to Defendant's house after the rape. He estimated that he had been to Defendant's house four or five times.

M.C was seventeen at the time of the trial, and he attended Hickman County High School with the victim, and he knew J.D. He said that the victim was younger than he was. M.C. testified that during the spring of 2013 he and the victim would occasionally hang out after school and go to Defendant's house or go skating. M.C. noted that he was still struggling with the passing of his mother at the time. He said that his friend, D.W, was Defendant's son. M.C testified that he and D.W. were in band together. M.C. said that he went to Defendant's house sometimes with D.W. M.C. testified that he and Defendant were "pretty good friends," and they had conversations about M.C.'s life. M.C. told Defendant about his relationships and girlfriends.

- 4 -

M.C. testified that he was at Defendant's house once or twice when the victim was there. Defendant was also there when the victim was there. M.C. testified that Defendant had alcohol at the residence most of the time when they were there. M.C. testified that they all would "pitch in money and [Defendant] would go to Dickson and buy some." He said that Defendant would either purchase Jagermeister or Vodka. M.C. recalled a point when the victim stopped coming to Defendant's house. Defendant would ask M.C. if he knew when the victim was coming over again. M.C. testified that Defendant would also say, "I want to go over like the other night again, and then he would be kind of hinting that it - - it be [sic] kind of like nudging at me. . ." M.C. said that he and Defendant had been talking about relationships when Defendant asked about the victim. M.C. testified that he spent the night at Defendant's house most of the time. On cross-examination, M.C. testified that Defendant never forced him to drink alcohol.

J.D. testified that he currently lives in Hendersonville, Tennessee with his mother and is enrolled in an online school. He previously lived with his father in Hampshire, Tennessee, located "technically" in Maury County but he had attended Hickman County Middle School. He was friends with D.W. who introduced him to Defendant. J.D. testified that D.W. referred to Defendant as his "uncle." They stopped by Defendant's house one night on Halloween and stayed approximately fifteen to thirty minutes. After that, J.D. testified that he visited Defendant's house "maybe every other weekend." J.D. said that M.C. and the victim would come over to Defendant's house. J.D. had known the victim since they were both in seventh grade. J.D. thought that the victim went to Defendant's house with J.D. two or three times. He said: "Sometimes we would just sit there and listen to music. Sometimes there would be drinking involved, but I would just mainly be hanging out with my friend, you know, we would just do typical stuff, talk so - -[.]" J.D. testified that Defendant sometimes had Vodka at the house, and one time there was rum or Jagermeister.

J.D. testified that he spent the night at Defendant's house [m]ost of the times that [he] went over there." The victim was not with him every time that he stayed at Defendant's house. J.D. testified that his memory of the night of the offense was a "little fuzzy." However, he distinctly remembered the victim "on the bed and I remember [the victim] was in pain and I was telling [Defendant] to stop." He also told Defendant that he was hurting the victim. J.D. specifically testified that Defendant was penetrating the victim's anus with Defendant's penis. J.D. testified that he could tell from the victim's facial expression that he was in pain. He did not recall if the victim said anything. J.D. testified that he was on the bed next to the victim when the rape occurred. He did not recall how the victim's pants were removed, and he said that Defendant was wearing pants but that they were unzipped and pulled slightly down. J.D. testified that the rape lasted approximately fifteen minutes, and he "felt powerless." He thought that he hugged the victim after the rape, and they both went to sleep.

J.D. testified that he could not remember everything that happened because "[w]e were inebriated." J.D. thought that he had been drinking Vodka and that he had more to drink than the victim. He believed that the victim went to Defendant's house with him one time after the rape occurred.

On cross-examination, J.D. testified that Defendant never forced him to drink alcohol. He said that Defendant was at the house every time that J.D. was there with the victim. J.D. did not believe that anyone other than he and the victim was at Defendant's house on the night of the rape. J.D. testified that he and the victim were lying on the bed with their head on the head board and their feet vertically on the bed. He said that they were not lying on the edge of the bed. J.D. thought that he and the victim had been in the bedroom talking for approximately thirty to forty-five minutes when Defendant walked into the room. J.D. testified that he did not call anyone to help stop the rape because he was afraid. The first time that he told anyone what happened was when his principal asked him about it.

Sergeant Levy Mobley of the Hickman County Sheriff's Office testified that he was working as a detective for the sheriff's office in the spring of 2013. He received information during that time that teenage boys were "hanging out" at Defendant's residence.

Sergeant Mobley interviewed the victim on April 19, 2013, at the victim's home. The victim's mother was present, and Detective Mobley asked the victim about what went on at Defendant's house. Detective Mobley testified that the victim was "reserved," and he would not give Detective Mobley much information. The victim admitted to being at Defendant's house and that he and other friends drank alcohol and watched pornographic movies while there. He told Detective Mobley that he had been to Defendant's house three to four times. According to Detective Mobley's notes, the victim said that Defendant was not at the house the first two times that the victim was there. The victim also said that Defendant was there for approximately fifteen minutes the third time, and Defendant was there the fourth time for the entire time the victim was at the house. The victim did not tell Detective Mobley anything about what happened to him personally at Defendant's house. Detective Mobley did not press the victim on the issue because it made Detective Mobley "a little bit uncomfortable." When asked why it made him uncomfortable, Detective Mobley testified: "Well, because he's a child and because of the allegations that I was aware of that been [sic] going on over there, I was a little uncomfortable with it."

Detective Mobley also talked with Defendant about what may or may not have been going on at his house. He testified:

[Defendant] advised me that the boys, you know, they would come over sometimes. He - - he had a son named [D.W.] that I guess they were supposedly friends and that's - - that was the connection, but anyway they - - he had - - he let boys come over and they stay around his house.

Defendant told Detective Mobley that he would allow the boys to drink "Fanta" and watch movies. Defendant also told him that he would talk to the boys about their problems at school and "stuff like that." Detective Mobley testified that Defendant denied allowing the boys to watch pornography, and he said that they only watched cartoons. Defendant told Detective Mobley that he kept alcohol in the refrigerator but that he never provided any to the boys.

On May 2, 2013, Detective Mobley was called to the Hickman County Middle School by the Principal. He spoke with J.D. and the victim, who was visibly upset and crying. Detective Mobley asked the victim specific and detailed questions, and their conversation lasted fifteen to twenty minutes. He said that the victim's demeanor was different than their first conversation on April 19, 2013. He also noted that victims of "sexual crimes don't always admit to it at first." Detective Mobley then referred the victim to the Child Advocacy Center to be interviewed. Detective Mobley also interviewed M.C. and D.W. Detective Mobley testified that the victim told him at the school that he had been to Defendant's house more than twice. He admitted that there were some small inconsistencies between what the victim told him on April 19, 2013, and what the victim told him on May 2, 2013, about how many times he was at Defendant's house. When asked if the inconsistencies concerned him, Detective Mobley testified:

Well, I mean it didn't really concern me because like I said before, it didn't surprise me on the first interview the fact that he didn't reveal anything, didn't - - because I'm sure he was ashamed and probably was a little embarrassed and didn't want to - - you know, I kind of took him by surprise because they had no idea why I was there . . .

Charlsi Legendre was working at the David House Child Advocacy Center in May 2013 as a forensic interviewer, and she interviewed the victim. The interview was video and audio recorded. Ms. Legendre testified that the victim was "very closed" and "very guarded." She also noted that he was not comfortable. Ms. Legendre testified that she gave a copy of the recorded interview to Detective Mobley. On cross-examination, Ms. Legendre testified that the victim was not emotional during the interview. She said that there were "some differences in some things" which she said was "typical of teenaged boys." The victim told her that he had been to Defendant's house three times. Ms. Legendre testified that the victim originally said that Defendant was at the house when he was there on one occasion, "but then he followed it up with a detail of two separate incidents."

On cross-examination, Ms. Legendre testified that according to her report, the victim said that J.D. was in the room during the rape, and J.D. had been back to Defendant's residence. The victim said that he thought the rape lasted between fifteen and thirty minutes. The victim also said that he fell asleep on the couch with M.C. after the rape was over. On redirect examination, Ms. Legendre testified that the victim's story never differed with respect to him being raped once while J.D. was in the room. She said that there were no inconsistencies in the victim's story other than the number of times Defendant was at the residence when the victim was there and whether M.C. was present at the time of the rape. Ms. Legendre also noted that "as the interview progressed [the victim] kind of clarified himself."

**Defendant's Proof**

Defendant testified that in March and April of 2013, he was living on Highway 48 North. He was disabled and not working at the time due to severe liver disease. Defendant said that he was also enrolled in the University of Phoenix.

Defendant testified that he did not rape the victim or touch him "sexually in any way." He said that there was alcohol at his house because of his roommate but Defendant denied giving it to any children. Defendant testified that he occasionally drank beer, and J.D. would bring "Faygo" to the house from the store next door. Defendant also denied watching pornography with the victim or J.D. He testified that he never knew when the victim was coming to his house. Defendant testified that he had no running water because his meter had been removed from the house.

On cross-examination, Defendant testified that D.W., who is now 20 or 21 years old, is his son. Defendant described their relationship as good. He said that D.W. did not live with him but D.W. would have his friends come to Defendant's house. Defendant remembered the victim, J.D., and M.C being there. He thought that he also remembered someone named "Chance," who had dropped D.W. off at Defendant's house "one time or something."

Defendant testified that in March and April of 2013 D.W. rarely came to Defendant's house. He said that D.W.'s friend came to Defendant's house when D.W. was not there to meet with either D.W. or "Elizabeth." Defendant testified that the friends would sometimes hang out with him if D.W. or Elizabeth was not there. Defendant said that he developed a relationship with the young boys and that they would "drop by and talk to [him] about stuff and ask him [stuff] about school, and some of them had girlfriend problems and just random stuff." He said that M.C. struggled with the passing of his mother. Defendant also said that he would provide food to M.C. "if he was there at night." He thought that M.C. spent the night at his house one time.

Defendant testified that J.D. did not come to the house very often because he was going to move to Hendersonville with his mother. He said that J.D. stopped by occasionally on Saturdays to meet with "Elizabeth." Defendant estimated that J.D. was at his house "no more than 10 times," and J.D. spent the night there four times. Defendant testified that he and J.D. were alone at the house on one or two occasions, and they sometimes watched movies such as "True Blood," and "the Vampire Diaries and stuff." They also may have watched one of the "Twilight" movies. Defendant said that he did not watch the movies with D.W., M.C., or the victim.

Defendant testified that D.W. stayed at his house "continually for about a week[]" because D.W. and his girlfriend had some "issues." He said that other times D.W. stopped by "randomly." Defendant testified that there were three bedrooms in his house. Defendant said that one of the bedrooms belonged to D.W., one belonged to him, and the third bedroom did not have electricity and was used for storage. Defendant also testified that since D.W. was not at the house very often, Defendant had obtained a roommate. Defendant also noted that he "slept a lot on the couch.

Defendant testified that alcohol was stored in the refrigerator and that it was "[b]eer mostly." He denied that the alcohol belonged to him. Defendant said that he occasionally drank alcoholic beverages to "flush [his] kidneys out." He said that it was never more than one beer. Defendant testified that there was a television in the living room that was connected to a VCR. Defendant denied watching any pornography on the television. He admitted that there was some pornography stored in the bedroom used for storage. Defendant testified that there was no plumbing in his house and that he had told the boys that visited his house to go next door to McDonald's to use the restroom rather than relieving themselves in his yard.

Defendant testified that the victim was only at his house twice. He said:

> [The victim] came both times with [J.D.]. I had no previous knowledge of him showing up. The intention was that Jake was coming to meet with Elizabeth. She was supposed to pick him up and they were supposed to go to her house so, occasionally, Elizabeth didn't show up and he was kind of stranded.

Defendant thought that M.C. was at the house one time while the victim was there. He said that the victim spent the night at his house one time, and the victim and J.D. slept in the "front bedroom," and Defendant slept on the couch. Defendant said that the victim and J.D. were talking and playing "their I-pod things" on the night that the victim spent the night. Defendant did not attempt to call the victim's mother or father that night since the two boys were "stranded" at his house. Defendant testified that it did not concern

him that two fourteen-year-old boys that he was not related to were spending the night at his house. He never asked them to leave or call their parents to pick them up. Defendant testified that neither the victim nor J.D. drank any alcohol that night. He thought that D.W. stopped by the house earlier that night but then left with his girlfriend.

Defendant testified that he did not talk to the victim much "because he was there with [J.D.]," and the victim's school still didn't . . .affect [him]." Defendant testified that the boys randomly showed up at his house, and he was "hospitable" to them. He denied talking to the boys about what was going on in their life. He thought that he told Detective Mobley that the boys knew they could talk to him if they needed to. He denied saying that he would talk to them about what was going on at school or that he would help them address "any type of identity issues." Defendant testified that he did not want to have a relationship with any of the boys but he never told them to leave his house. He said that he would have discussed some issues with the boys but other issues needed to be addressed by their parents.

Defendant testified that he had met M.C.'s father but he never contacted him to express concern about how M.C. was processing the death of his mother. He also never called J.D.'s parents to let them know that he was cutting himself. Defendant admitted that J.D. told him that he was cutting himself, and he showed the cuts to Defendant. Defendant said that he told D.W. and M.C. that they needed to talk with J.D. about the cutting. Defendant was not sure if he was present each time that the victim was at his house because there was a key on the front porch, and D.W. knew where it was. Defendant again denied giving the boys alcohol or mixing alcoholic drinks for them. He said that he did not pour "shots" for the victim. Defendant said that he last saw M.C. and J.D. in April of 2013. He did not recall the last time that he saw the victim. Defendant testified that he was surprised by the allegations that the victim made against him. He denied ever asking M.C. when the victim was coming back to the house, and he denied talking about M.C.'s "sex life."

On redirect examination, Defendant asserted that he is homosexual. He thought that D.W. was his biological son although that had never been confirmed. He noted that he went through a "bisexual stage" where he thought that he "could deal with females, but over a period of time [he] realized that [he] was more interested in males[.]"

**State's rebuttal Proof**

D.W. testified that he is currently twenty years old. He attends school and works at McDonald's. He described his relationship with Defendant as follows: "[H]e was friends with my mom for 20 plus years and he was like a father figure to me growing up so naturally I just heard he moved in so I started going down there." D.W. testified that his mother had told him that Defendant was not his biological father.

D.W. testified that J.D. is one of his friends, and they met while D.W. was living with another friend. D.W. testified that he was living at Defendant's house between September and November of 2012. He also stayed at his girlfriend's house sometimes. D.W. wanted J.D. to come over to Defendant's house to "hang out." D.W. testified that he saw M.C. at the house during that time, and there was alcohol in the home that Defendant bought and brought in. He said that Defendant offered some of the alcohol to him but he did not drink any. D.W. testified that he saw J.D. and M.C. drinking alcohol and Defendant's house and that Defendant mixed their drinks and gave it to them.

*Analysis*

### A. Failure to Strike a Juror for Cause

In order to protect the identity of the juror who is the subject of this issue, we will identify her as "Juror A." Defendant argues that the trial court erred by failing to strike Juror A from the jury panel because Juror A stated that she had been raped when she was between the ages of ten and thirteen by a family member. However, Juror A also told the trial court that she could be impartial if selected as a juror.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Tooms v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (Tenn. 1954)). In Tennessee, challenges to juror qualifications generally fall into two categories: propter defectum, "on account of defect"; or propter affectum "for or on account of some affection or prejudice." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. *Akins*, 867 S.W.2d at 355. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. *Id.* "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). The defendant bears the burden of proving a prima facie case of bias or partiality. *Id.* (citing *Taylor*, 669 S.W.2d at 700).

Relative to challenges of prospective jurors for cause, Rule 24(b), Tennessee Rules of Criminal Procedure, provides in part as follows:

Any party may challenge a prospective juror for cause if:

(1) There exists any ground for challenge for cause provided by law; or

(2) The prospective juror's exposure to potentially prejudicial information makes him unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and if he remembers information that will be developed in the course of the trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented." *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). The United States Supreme Court has made the following observation:

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Thus, so long as a juror can set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, the juror may properly participate in the case. *Id.* Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *Howell*, 868 S.W.2d at 248; *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause is grounds for reversal

only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990).

In the case under submission, it is not clear from the record whether Defendant did, in fact, exhaust all of his peremptory challenges prior to requesting that Juror A be removed from the panel for cause. The record shows that challenges were exercised but not by which party. At one point, the trial court noted that the "defense [was] nearly out of challenges." Even if Defendant exhausted all of his preemptory challenges, there is no evidence that the jury who heard the case was not fair and impartial. This alone prevents him the relief he seeks. We further conclude that the trial court did not err when it declined to excuse Juror A for cause. The following exchange took place between the trial court and Juror A:

> THE COURT: What has been your life experience with the offense of rape or sexual assault?
>
> JUROR A: I was raped as a child.
>
> THE COURT: Okay. Was it a family member or non-family?
>
> JUROR A: Family Member
>
> THE COURT: It was by a family member. Have you had to have counseling or any kind of - -
>
> JUROR A: Counseling, yes.
>
> THE COURT: And that was obviously a traumatic thing to have happen to anybody in life. By the same token, you understand [Defendant] is presumed innocent. He comes to this Court with that presumption. And it is the burden of the State of Tennessee to establish his guilt beyond a reasonable doubt. And both the State and the Defendant are entitled to have jurors that will be fair and impartial. And the question I have for you is whether you can put that life experience out of your mind and judge the guilt or innocence of [Defendant] strictly based on the evidence you hear?
>
> JUROR A: I believe I can.
>
> THE COURT: Okay. Very well.

- 13 -

Juror A told defense counsel that the person who raped her was never prosecuted. When asked if she would hold Defendant's denial of the rape in this case against him, Juror A replied: "No." Juror A clearly indicated that she could set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, meaning that she could properly participate in the case. *See Irvin*, 366 U.S. at 722-23. The Defendant is not entitled to relief on this issue.

### B.  *Failure to Declare a Mistrial*

Defendant argues the trial court abused its discretion by denying his motion for mistrial made during after the victim's direct examination. We disagree.

Courts should only declare a mistrial in a criminal matter when required by manifest necessity. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is an appropriate remedy when the trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court, and this Court will not interfere absent a clear abuse appearing on the face of the record. *State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998). The party seeking the mistrial has the burden of establishing the necessity for it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App.1996).

During the victim's direct examination, the State asked why he decided to talk to Ms. Thigpen at school. The victim replied: "She told me that I could trust her and I believed her and he was already, I guess, he was already caught. He was already in jail." There was no objection to the victim's testimony at that time. After the victim's direct examination, there was a short recess, and the jury was excused. The following took place:

> [Prosecutor]:    This is a difficult trial to have because there's so many other events and so many other charges that [Defendant] had. I want to just make sure that - - that - - and we've spoken to [the victim] and [the victim] knows this, but just to make sure that during cross-examination if [Defense Counsel] were to ask him a question, that he still knows he's not supposed to talk about other victims, that he's not supposed to talk about [Defendant] - - and sorry, I refer to him as [Defendant]. That what [the victim] has been calling him - - that [Defendant] has been arrested for other crimes, that he's been charged with other crimes and sometimes it's difficult as you can imagine when you're under the stress of cross-examination, and so I want - - and [the victim] knows this, that I just want him to understand that no time is [Defense Counsel], I would assume, soliciting any type of answers that

- 14 -

would indicate that [Defendant] that - - there are other crimes, that he's been arrested, that he's been in jail, and so I wanted to just make sure we are clear on that.

And then also we have it - - forensic interview that [the victim] did that we listened to last in out last hearing and it's very difficult to hear as we all recall. The attorneys have agreed that the summary that the forensic interviewer prepared is accurate as to the video, and so when [Defense Counsel] cross-examines [the victim], he may ask him a question; do you recall speaking with the forensic interviewer, do you recall making this statement and [the victim] may or may not remember saying it. If he doesn't remember it, the State is fine with [Defense Counsel] showing [the victim] the written summary, asking him to read it and then at that point, [the victim] at that point can either say, yes, you know, I remember saying it. And that's how we're going to try to do it without actually playing the video, and then I wanted [the victim] to understand the process because it's confusing, obviously, when you're not an attorney.

\*       \*       \*

[The Court]:      [To the victim] But under our rules of evidence, under most circumstances, it's improper for the jury to know that he's been charged with the other offenses because [their]  - - [their] focus is on the offense that related to you.

So unless some question is asked of you that you think would require you to speak about other offenses, you shouldn't do that. If you think it does require you to speak about other offenses then you shouldn't do that. If you think it does require you to speak about other offenses then you say I'd like to ask the judge a question. So before you answer the question that would relate to any kind of other offense, you just stop and I'll let the jury go out and then you can - - you can ask for clarification, okay?

[The victim]:      (Nods head.)

[The Court]:      Very good. And then the lady that Ms. Mason talked to you about that you went to visit and you didn't remember her name and you didn't remember where you went, she recorded your meeting with her and she's prepared a summary, so it on cross-examination you're asked questions about what you said to her, if you don't

remember, that's fine. [Defense Counsel], who represents [Defendant], will let you read the summary, and then if it refreshes your memory you can then answer the question. If it doesn't refresh your memory you don't have to answer. You can just say I'm sorry, I still don't remember. You understand?

[The victim]:        Yes, sir.

[The Court]:        Very well. Let's take a break.

[Defense Counsel]:Judge, I may need to ask her - - if I recall, I believe in his prior testimony he did mention something that when he once talked to Ms. Thigpen she told him that my client was already in jail so that he could trust her.

[The Court]:        Yes.

[Defense Counsel]: May need to talk about a limiting jury instruction on that.

[The Court]:        Well, you - - you be thinking about it. It was very quick and it was - - he was very soft when he said it.

[Defense Counsel]:  Okay. And I was in the middle of - -

[The Court]:        I understand, but if I give a limiting instruction then I am absolutely will be highlighting it, but - -

[Defendant Counsel]:  I understand.

[The Court]:        But if the defense wants a limiting instruction, I will give a limiting instruction. So it's clearly his reference to the fact that [Defendant] had been caught and was in jail, I think those were the words that he used, came out, but I picked up on it, but it was said softly and I'll let you - - I'll let you - -

[Defense Counsel]: I mean I would ask for a mistrial at this time based on that.

[The Court]:        Well, and I would overrule your mistrial, but I will tell you without equivocation I'll tell the jury that they're totally directed to disregard that statement.

- 16 -

[Defense Counsel]:  Okay.  If I - - let me talk to my - -

[The Court]:       That's right.  You talk to your client, and if there's any - - any - - any desire whatsoever on your client's part for me to tell the jury that that statement is to be totally disregarded, I will be happy to do that.

Our review of the record shows that after the recess, Defendant began cross-examination of the victim without requesting a curative instruction concerning the victim's prior testimony.  Based on our review of the record, "manifest necessity" did not require a mistrial.   As set forth above, the trial court stated that the victim was very soft spoken when he said that Defendant had been caught and was in jail when the victim agreed to talk to Ms. Thigpen.  Defense counsel did not express any disagreement.  Also, defense counsel did not specifically request a curative instruction after he was allowed time to discuss it with Defendant.  Defendant has not met his burden of establishing the necessity for a mistrial and is, therefore, not entitled to relief on the issue.  We affirm the trial court's denial of the defendant's motion for mistrial.

### C.  Sufficiency of the Evidence.

Defendant contends that the evidence at trial was insufficient to support his conviction for rape.  Specifically, Defendant asserts that the evidence failed to show he "actually penetrated the victim."  He also states that there were numerous discrepancies in the testimony of the victim and J.D.  The State responds that the evidence was sufficient to sustain Defendant's convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'"  *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage,*

571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

A applicable to this case, rape is the unlawful sexual penetration of a victim by the defendant accomplished by force or coercion, without the consent of the victim, and the defendant knows or has reason to know at the time of the penetration that the victim did not consent, *or* where the defendant knows or had reason to know that the victim is mentally incapacitated or physically helpless. T.C.A. § 39-13-503(a)(2)-(3). "Sexual penetration" includes sexual intercourse, cunnilingus, anal intercourse, or any other intrusion, however slight, of any part of a person's body into the genital or anal openings of the victim's body. T.C.A. § 39-13-501(7).

The victim testified that Defendant mixed rum and Mountain Dew prior to the rape, and the victim drank two cups of the mixture. The victim said that he began to feel lightheaded and off balance. He further said, "Like whenever I was turning or tried to move my eyes everything felt like it was going like in slow motion and moving all together I guess." The victim testified that Defendant also showed him and J.D. some pornography that was playing on television. Later on, while the victim and J.D. were sitting on the bed and talking in the back room of the house, Defendant walked in and asked the victim if he wanted to "try anal or anything with a guy," and the victim told him that he did not want to. The next thing the victim remembered was being face down and feeling a sharp pain inside his "butt." He also felt a "ripping sensation." J.D. testified that he was in the room during the rape, and he said that Defendant's pants were unzipped and pulled slightly down. He specifically testified that Defendant was penetrating the victim's anus with Defendant's penis. He also said that he saw Defendant "thrusting" with his body. J.D. testified that the victim's pants were unzipped and pulled down during the rape. J.D. said that he told Defendant to stop and that Defendant was hurting the victim.

The jury, as was its prerogative, obviously accredited the testimony of the State's witnesses and resolved any discrepancies in favor of the State. Therefore, we conclude that the evidence is sufficient to support Defendant's conviction for rape.

### D. Sentencing

The Defendant claims the trial court abused its discretion by ordering him to serve twelve years for his rape conviction. However, we find that the trial court imposed a sentence within the appropriate range after a proper application of the purposes and principles of our Sentencing Act.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." *Bise* 380 S.W.3d at 709. Moreover, this court may not disturb the sentence even if it had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The same standard applies when a defendant challenges the denial of probation or other alternative sentence. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e) (2010); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Id.* at 705-06. The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401 (2010), Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf

about sentencing. *See* T.C.A. § 40-35-210(b) (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court should also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103(5) (2010).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2010).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2010 & Supp. 2013); *see also Bise*, 380 S.W.3d at 699 n. 33, 704; *Carter*, 254 S.W.3d at 343. "[A] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

In this case, the trial court properly applied the principles and purposes of sentencing and explained its reasoning for the sentence imposed. As such, we review the trial court's sentencing decision for an abuse of discretion with a presumption of reasonableness.

The applicable sentencing range for a Range I offender convicted of a Class B felony is 8 to 12 years. T.C.A. § 40-35-112(a)(1)-(2). The trial court found that Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A.§ 40-35-114(1). The trial court found this factor to apply because Defendant had a history of providing alcohol to minors and showing pornography to them. The trial court also made the following findings:

In factor number 3 the State would urge that there is more than one victim here. The Court is persuaded that the defense has cited law that establishes that that factor strictly does not apply. And while the strict application of that factor is not appropriate by the Court, the Court does believe that [J.D.], who himself was also under the influence of alcohol and acknowledged that during the course of this trial, found himself in a position of helplessness in trying to come to the rescue of his friend who was being raped by [Defendant]. So while I don't believe the factor applies in the strict sense, the facts themselves are something the [court] clearly takes into consideration in making a decision.

In factor 4, whether the victim of the offense was particularly vulnerable because of age or physical or mental disability. Again, the Court finds itself with a 14 year old boy. I don't have any evidence before me that he was particularly vulnerable. I think the strict application of that enhancing factor would be inappropriate based upon the law that the Defense has sited [sic] to the Court. But I can't ignore, while not employing that as an enhancement factor, I can't ignore the fact that [Defendant] to some measure incapacitated the victim through his supply of alcohol to him. And that in combination with [Defendant's] size and weight made the victim incapable of resisting. So, I don't find the strict application of number 4 to be appropriate, but the facts are certainly to be taken into consideration in the overall decision of the Court.

Factor number 6 relates to personal injuries, and the Court would note on that regard that the presentencing report in this case establishes that the victim has experienced nightmares. He had thought a lot about this - - this rape that occurred. He has experienced nightmares. He has experienced depression to the point where he has wanted to commit suicide. And it has caused pain in his anal area. He also notes for the Court's consideration in the last two years he has to undergo many blood test[s] to be checked for STD's. So, it has created fear and anxiety with him, apprehension. He also notes that he has been scared to go anywhere because of the fact that he lives here in Hickman County and [Defendant] in the past has lived here in Hickman County. He - - until the trial of this case, the victim was afraid to get out and go places for fear that he would see [Defendant]. And that he's not even felt safe in his own home. Clearly the victim has been emotionally injured in a significant way. And the victim notes that coming to Court, seeing [Defendant] and talking about this has brought all of these feelings back. He further notes in the victim impact statement, he felt powerless. He couldn't do anything in defense because he was intimidated and that the

event has put him through so much stress. And following the event he has suffered depression, guilt, and stress.

The State has not supplied the Court with any case from the Appellate Court or Supreme Court that would say that under the facts and circumstances on this particular case the physical injuries that were sustained by the victim, which has resulted in prolonged difficulty with hemorrhoids and the emotional injury sustained by the victim which at times has caused him to even consider suicide, would be considered particularly great.

Based upon the law the Court has been furnished by the Defense, the Court believes that the strict application of that factor might be incorrect. But I can't ignore those facts that I just related to everyone, at least in making my overall decision.

Number 7 is the issue of whether the offense was committed to gratify the defendant's desire for pleasure or excitement. [Defense Counsel] and I had a conversation about that when the Defense was arguing that there's no evidence to that effect. The Court just simply at that time and still disagrees with the Defense on that point.

The evidence establishes that [Defendant] approached the victim, asked him if he wanted to do anal. The victim declined, and he then came in and disrobed the victim, disrobed himself at least partially and commenced to rape the victim. That evidence leads to the Court's inescapable conclusion that this conduct of [Defendant] was for his own pleasure or excitement. And it was done to gratify his desire for pleasure and excitement. So, the Court finds that that factor does in fact apply.

On factor number 23, again, I have looked at that and it doesn't include alcohol. And the Defense has correctly pointed out that the Legislature in including factor number 23 in the enhancing factors specifically uses controlled substances, controlled substance analogue and other illegal drugs with a minor. In other words it says, the defendant is an adult and sells to or gives or exchanges a controlled substance, controlled substance analogue or other illegal drug with a minor. So, the Court believes that strict application of factor number 23 would not be appropriate in reaching a decision.

But as I mentioned earlier I can't ignore the fact that part of the M-O of [Defendant] was to groom these minors through the use of alcohol and pornography. And in this case the use of alcohol rendered both the victim and the witness incapable of preventing this attack. So, I'm not

applying it strictly, but I'm noting that the facts should be taken into consideration and I am doing that in some measure.

As far as mitigating factor number 1, there was no serious bodily injury based on the Code definition. The Court agrees with the Defense that based upon the definition set forth in our Tennessee Code regarding the definition of serious bodily injury, it doesn't exist. There is clearly bodily injury involved here, but it is not of the kind that is described by our Legislature.

*See* T.C.A. §§ 40-35-114(3), (4), (6), (7), and (23); § 40-35-113(1).

The State also asked the trial court to consider enhancement factor fourteen in that Defendant abused a position of public or private trust and used that in a manner that significantly facilitated the commission of fulfillment of the offense. T.C.A. § 40-35-114(14). The State argued that Defendant had a public trust with the young boys at his house by providing him with a place to stay, and he furnished alcohol to them. The trial court noted that if J.D. had been the victim in this case, it would have felt more comfortable applying this factor. However, the court ultimately refused to apply factor fourteen. The trial court then made further findings concerning Defendant's sentence:

However, when I look at all of the information I have before me and I go back to - - I go back to what I talked about earlier. And that's [Defendant's ] position in connections with his conduct. And you can see that in the presentencing report that's part of the psychosexual evaluation and it is under the topic of attitudes. And this is what I was trying to talk about earlier. It says: When asked to explain events leading up to the sexual offense charged [Defendant] explained that there was one victim and one "watcher," quote, unquote. Both being 14 year old boys. [Defendant] made it clear that he had a different version than the victim's. He said that he reported to have met the victims, plural, twice because they were real tight with his 18 year old son.

Well, we know that's not true. We know [J.D.] had been there multiple, multiple times. And we know that [Elizabeth] was as much or more involved than [Defendant's] son.

And they had all gotten together to hang out. That's true, [Defendant] made his home a place where teenagers go and hang out. And then he said he was asleep. And then it says, one victim according to [Defendant] said he was raped while the other boy watched. [Defendant] described one of the victims as being "gay", quote, unquote.

- 23 -

And this is what he says in the presentence - - I mean the psychosexual evaluation. He stated that the victims did not live in his neighborhood but somewhere in the county. He denied - - he denied knowing where either victim lived. Yet the proof in this case as [sic] that - - the proof in the case today and before was that he was willing to give them rides to places they needed to go, including their homes.

Then he says the victims lied as he would never commit rape. He described rape as "aggressive," quote, unquote, and he does not feel he is aggressive. He has no theory to offer for why the victims would have lied about him.

Now, that was the very question I put to him. And he answered the same way to me that he answered to the lady, I believe her name was Brakebill [sic] or whatever it was, that did the psychosexual evaluation. Let's see I can get her name here pretty quickly.

&ast; &ast; &ast;

Yes, Kelly Blackwell. He has no idea, no plausible explanation for why all these people would have ganged up on him and lied about him. And then he goes on to say this; during this assessment it became evidence that [Defendant] has - - has several he blames, meaning he had several persons, he blames for his current situation; those being his son, his son's future mother-in-law, the school guidance counselor, the local newspaper, the local police and the victims. And this is what I want to highlight: Mr. Thornton took no responsibility for the situation or his actions.

So in reaching the Court's decision regarding the appropriate sentence within the range, I keep going back to this notion that [Defendant] is a sexual predator. It is that simple. And he poses an extraordinary threat to this community. And he is going to continue to pose that threat unless and until he acknowledges this culpability. Because until that happens, he can't be rehabilitated and he can't be treated.

So, based upon all the evidence I have before me considering enhancing and mitigating factors, and the Court's view of the evidence both today and at trial, the Court finds that the sentence should be set at 12 years.

Because the trial court properly considered the evidence offered by the parties, stated on the record what enhancement and mitigating factors were considered, and complied with the purposes and principles of sentencing and imposed a within range

sentence, the trial court did not abuse its discretion in enhancing Defendant's sentence. Defendant is not entitled to relief.

Defendant also argues that he should have been sentenced to probation because his twelve-year sentence was excessive and should be reduced. However, since we have found that Defendant's twelve-year sentence was properly imposed and not excessive, Defendant is not eligible for probation. A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a).

Accordingly, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE